# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Fr. Christopher Thomas Wenthe,               Case No. 0:16-cv-03866-MJD-KMM

              Petitioner,

v.                                          **REPORT AND**
                                      **RECOMMENDATION**

Tom Roy, *Minnesota Commissioner of Corrections*,

              Respondent.

---

Paul C. Engh, 200 S. 6th St., Ste. 420, Minneapolis, MN 55402, counsel for petitioner

Peter R. Marker, Ramsey County Attorney's Office, 345 Wabasha Street N., St. Paul, MN 55102, counsel for respondent

---

Father Christopher Thomas Wenthe filed a habeas corpus pursuant to 28 U.S.C. § 2254 challenging the validity of his 2011 conviction for engaging in criminal sexual conduct. Fr. Wenthe was convicted of violating a Minnesota statute prohibiting a priest from having sexual contact with a parishioner while offering spiritual advice, aid, and comfort. Pet., ECF No. 1. In his habeas petition, Fr. Wenthe raises five separate claims for relief.

First, Fr. Wenthe argues that his conviction violates due process because he was prohibited from presenting a complete defense through his own testimony. *Id.* at 31-39. Second, he asserts that his right to due process was violated when he was prohibited from fully cross examining the victim, A.F., about their mutual interest in a sexual relationship. *Id.* at 39-43. Third, he argues that his conviction violates due process because Minnesota's clergy sexual conduct statute does not require the State to prove that he acted with criminal intent. *Id.* at 42-49. Fourth, he claims that Minnesota's clergy sexual conduct statute violates the Establishment Clause of the

First Amendment. *Id.* at 49-58. And finally, Fr. Wenthe alleges that his conviction violated his right to due process because the jurors were not properly instructed that they must reach a unanimous verdict. *Id.* at 58-61.

Following Fr. Wenthe's conviction, the Minnesota appellate courts wrestled with his direct appeal, issuing a total of four separate decisions comprising seven distinct opinions.[1] Although the Court shares the concerns raised by individual Minnesota judges and justices regarding the issues presented by Fr. Wenthe in his habeas petition, the questions before the Court now are not how it would decide these issues in the first instance. Based on the very deferential standards applicable to habeas proceedings like this one, the Court cannot conclude that the judgment of the State court was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Accordingly, the Court recommends that Fr. Wenthe's Petition be denied.

**Factual Background**

The Minnesota Supreme Court described how Fr. Wenthe and the alleged victim, identified by her initials A.F., came to know one another:

> Wenthe was a Roman Catholic priest at a Saint Paul, Minnesota, parish. In the summer of 2003, Wenthe met A.F., a parishioner, at a picnic. A.F. gave Wenthe a ride back to the parish where they discussed

---

[1]    Fr. Wenthe's direct appeal first resulted in the Minnesota Court of Appeals overturning his conviction on Establishment Clause grounds in *State v. Wenthe* ("*Wenthe I*"), 822 N.W.2d 822 (Minn. Ct. App. 2012). The Minnesota Supreme Court reversed that conclusion and remanded to the court of appeals for further consideration of the other issues Wenthe raised in *State v. Wenthe* ("*Wenthe II*"), 839 N.W.2d 83, 85-87 (Minn. 2013). Following remand, the Minnesota Court of Appeals again reversed Fr. Wenthe's conviction based on a number of errors during his trial in *State v. Wenthe* ("*Wenthe III*"), 845 N.W.2d 222 (Minn. Ct. App. 2014). The Minnesota Supreme Court again disagreed with the court of appeals' conclusions in *State v. Wenthe* ("*Wenthe IV*"), 865 N.W.2d 293 (Minn. 2015), ultimately affirming his conviction.

some of A.F.'s personal struggles. A.F., who was sexually abused as a child and suffered from bulimia, sought guidance from a "spiritual director" at the parish in the fall of 2003. The spiritual director advised A.F. to obtain both a trained lay therapist and a "regular confessor" to help her deal with her eating disorder. A.F. approached Wenthe to be her "regular confessor." Wenthe agreed and, in October 2003, he heard A.F.'s confession. According to A.F., Wenthe heard her confession anonymously three or four more times after the October 2003 confession. It is undisputed that over time Wenthe and A.F. formed a friendship, spent time together in social contexts, shared their personal concerns and struggles, and talked for hours about theological matters.

*Wenthe II*, 839 N.W.2d at 85.

After meeting and forming a friendship, A.F. and Fr. Wenthe met again on his birthday in November 2003 at her apartment. They talked throughout the night about a number of topics including religion and sexuality as well as AF's abuse as a child. *Wenthe II*, 839 N.W.2d at 85.

The next evening, Wenthe and A.F. met in Wenthe's private quarters in the church rectory. The parties disputed the purpose for this meeting. A.F. testified that she met with a lay therapist for the first time that day, an experience she found overwhelming. A.F. said that she wanted aid and comfort after her lay therapy session and so she decided to accept the offer she said that Wenthe made the previous night to "call him after" her session. Wenthe disagreed that A.F. met him at his invitation. He testified instead that he and A.F. simply agreed to get together in his private quarters later that day. While they disagreed over the purpose of the meeting, both Wenthe and A.F. testified that they engaged in sexual conduct that evening.

*Id.*

After this November 2003 meeting, Fr. Wenthe and A.F. "engaged in sexual conduct about once every 2 weeks for approximately a year." *Wenthe II*, 839 N.W.2d at 85. A.F. considered Fr. Wenthe to still be her priest during this period, whereas Fr. Wenthe testified that their relationship had already changed so that he was no

longer her priest at that time. *Id.* at 85-86. Fr. Wenthe and A.F. last had sexual contact in early February 2005. *Id.* at 86.

Near the end of the summer in 2005, A.F.'s friend reported the relationship between A.F. and Fr. Wenthe to the archdiocese, and A.F. met with an advocate of a clergy-abuse program and with the archbishop and a bishop. *Wenthe II*, 839 N.W.2d at 86.

> [A.F.] sent a letter to the archbishop detailing her relationship with Wenthe. A.F. testified that her motivation for dealing with this matter through the church was to make sure "that this couldn't happen to anyone else." A.F. testified that the church assured her that there were "things in place that would ensure that . . . Wenthe was getting help." The priest who met with A.F. interviewed Wenthe regarding the relationship, and this priest testified that Wenthe told him that he had an illicit relationship with A.F., and that he had provided some pastoral care to her.

> A.F. testified that she was comfortable with how the church handled the situation, in part because Wenthe was only an assistant priest. But A.F. became concerned in 2009, when she discovered that Wenthe had been assigned to be the parish priest in Delano. A.F. sent letters to the new archbishop and, after the church told A.F. that Wenthe had been rehabilitated, she went to the police.

*Id.* Following her report to the police, the State charged Fr. Wenthe with violating Minnesota's clergy sexual conduct statute, Minn. Stat. § 609.344, subd. 1(*l*)(ii) (2012), "which prohibits sexual conduct between a clergy member and a parishioner that occurs while the parishioner is meeting with the clergy member on an ongoing basis for spiritual counsel." *Id.*

### Trial and Appellate Issues

#### *Establishment Clause*

Before the trial commenced, Fr. Wenthe moved to dismiss the charges against him, arguing that the clergy sexual conduct statute violates the Establishment Clause

of the First Amendment. *Wenthe II*, 839 N.W.2d at 86. The trial court denied the motion and Fr. Wenthe sought to preclude the State from offering any evidence of Catholic Church doctrine and procedures. *Id.* The State initially represented that it would not use any such evidence, but ultimately it did present "some evidence that related to Catholic Church doctrine." *Id.* Fr. Wenthe appealed the trial court's denial of his Establishment Clause motion, and the Minnesota Supreme Court ultimately decided this issue against Fr. Wenthe when it issued its first decision in 2013, *id.* Fr. Wenthe seeks review of this issue in Ground 4 of his habeas petition.

### *A.F.'s Sexual History and Conversations*

Also before his trial began, Fr. Wenthe sought an order *in limine* permitting him to testify about and to cross-examine A.F. regarding her past sexual practices, but the Court denied his motion. The State promised that "it would limit sexual-history evidence to the sexual abuse suffered by A.F. as a child, [but] at trial the State introduced evidence that A.F. was sexually inexperienced compared to Wenthe." *Wenthe IV*, 865 N.W.2d at 298. Fr. Wenthe renewed his motion to admit evidence of A.F.'s sexual history. *Id.* He argued his testimony would "show the source of her sexual knowledge and . . . explain how the relationship became sexual." *Wenthe IV*, 865 N.W.2d at 305. The trial court denied his motion again, finding that his proposed testimony and cross-examination violated Minnesota's rape shield law. *Id.* (citing the rape shield law, Minn. Stat. § 609.347, subd. 3).

The Minnesota Court of Appeals agreed with Fr. Wenthe that the district court had abused its discretion by excluding this evidence and violated his due process right to present a complete defense, especially in light of the fact that the prosecution had opened the door to the admission of sexual-history evidence. *Wenthe III*, N.W.2d at 234-35. The Minnesota Supreme Court agreed that the State "should not have introduced evidence indicating that A.F. was sexually inexperienced and abstained from vaginal intercourse to protect her virginity, and the district court abused its discretion by allowing it to do so." *Wenthe IV*, 865 N.W.2d at 306 (internal quotations and alterations omitted). But, the supreme court disagreed that the district court

abused its discretion because the excluded evidence was not significantly probative of any material fact and it was unfairly prejudicial. *Id.* at 307. In addition, the court explained:

> Fr. Wenthe testified that he and A.F. had discussed the type of sexual behavior that might interest one another and past sexual practices that they had respectively engaged in, and Wenthe's counsel vigorously cross-examined A.F. regarding Wenthe and A.F.'s conversations about sexual matters.

> Most importantly, Wenthe was allowed to—and did—testify at length about his perception of his relationship with A.F. He believed that their relationship "changed very quickly" into one based on sexual desire rather than spiritual guidance. The jury evidently rejected Wenthe's version of the facts, and Wenthe provides no reason to conclude that the verdict would have been different if the jury knew more about A.F.'s past sexual experiences. Based on this record, the verdict was surely unattributable to the error, if any.

*Id.* at 308 (internal quotations and alterations omitted). Fr. Wenthe challenges the Minnesota Supreme Court's handling of this issue in Grounds 1 and 2 of his habeas petition.

### Unanimity Instruction

On the first day of Fr. Wenthe's trial, the State amended its complaint to add a second count of third-degree criminal sexual conduct under Minn. Stat. § 609.344, subd. 1(*l*)(i), "which prohibits sexual conduct between a clergy member and a parishioner that occurs during the course of a single meeting in which the parishioner sought or received spiritual counsel."[2] *Wenthe II*, 839 N.W.2d at 86. In charging this second count, the State drafted the complaint vaguely, "alleg[ing] multiple violations

---

[2]    As noted above, the original complaint charged Fr. Wenthe with violating a separate provision of the clergy sexual conduct statute that prohibits sexual conduct where the clergy member and parishioner are meeting on an ongoing basis. Minn. Stat. § 609.344, subd. 1(*l*)(ii). The jury ultimately acquitted Fr. Wenthe of violating this subdivision. *Wenthe IV*, 865 N.W.2d at 298.

of the single-meeting offense, occurring over the course of 2 months, in a single count." *Wenthe IV*, 865 N.W.2d at 299. During the trial, "testimony described at least three possible meetings [between November 1, 2003 and December 31, 2003] that might satisfy the single-meeting element of the offense[.]" *Wenthe III*, 845 N.W.2d at 228. These meetings occurred on Nov. 13, Nov. 14, and an unknown date a few weeks later. *Id.* The trial court instructed the jury that their verdict had to be unanimous, but did not tell them "that each juror must agree on the event satisfying the single-meeting element of clergy sexual conduct." *Id.* Fr. Wenthe did not object to this jury instruction at trial, but the Minnesota Court of Appeals agreed with him when he argued that the trial court had committed plain error in failing to instruct the jurors that each of them must agree on the particular meeting at which the requisite sexual contact occurred. *Id.* at 229-31. The Minnesota Supreme Court disagreed. The supreme court concluded that even if the district court erred in its unanimity instruction, such an error was not plain because it did not affect Fr. Wenthe's substantial rights. *Wenthe IV*, 865 N.W.2d at 299-301. Fr. Wenthe raises this issue in Ground 5 of his habeas petition.

### Mens Rea

Fr. Wenthe asked the trial court to instruct the jury that a clergy member charged with violation of the clergy sexual conduct statute "must have subjective knowledge of the purpose of the meeting at which sexual penetration occurred." *Wenthe IV*, at 301. The district court rejected Wenthe's proposed instruction and told the jury that a clergy member only had to have the intent to sexually penetrate. *Id.* The Minnesota Court of Appeals disagreed and "concluded that the district court's instruction misstated the law because the clergy sexual conduct statute requires proof of a particularized knowledge that the complainant sought spiritual counsel." *Id.* (citing *Wenthe III*, 845 N.W.2d at 232-33) (internal quotations omitted). Again the Minnesota Supreme Court reversed. Interpreting the clergy sexual conduct statute, the court concluded that because "the clergy sexual conduct statute does not require the clergy member to know that the complainant seeks or is receiving spiritual counsel[,]

[t]he district court . . . did not err by refusing to give Wenthe's proposed jury instruction." *Id.* at 305. Fr. Wenthe addresses this issue in Ground 3 of his habeas petition.

## I.    Habeas Standard: Highly Deferential Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, governs the Court's review of Fr. Wenthe's habeas petition. Pursuant to AEDPA, district courts "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Further, AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

28 U.S.C. § 2254(d)(1).

Interpreting the "contrary to" clause of 2254(d)(1), the United States Supreme Court has stated that:

> a state-court decision can be "contrary to" this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *Yang v. Roy*, 743 F.3d 622, 625-26 (8th Cir. 2014) (same, citing *Williams*).

For a state court's decision to involve an "unreasonable application" of clearly established federal law, "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Further:

> A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . . [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 411.

### Not a Tie-breaker

Against this backdrop of great deference to the decisions of the Minnesota courts, the Court must address Fr. Wenthe's invitation to step into the fray as a judge considering these issues independently. Referencing the disagreement evident in the several opinions from the Minnesota Court of Appeals and the Minnesota Supreme Court, Fr. Wenthe acknowledges that "[o]rdinarily [the AEDPA standard] is a difficult standard to meet." Pet. at 30-31. But he continues:

> Of the eight Minnesota appellate judges who reviewed this case (five in the Supreme Court and three in the Court of Appeals) four agreed that the trial rulings were in conflict with Supreme Court precedent and four did not.
>
> This Court is now the tiebreaker.

Pet. at 31 (citing a reference to the "unreasonable application" standard articulated in *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013), which quoted *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

This argument, though rhetorically clever, utterly upends the unreasonable-application standard found in the AEDPA. The federal court's role is not to act as the

tie-breaker between state appellate judges' reasonable differences of opinion. Rather, AEDPA limits federal courts' "authority to issue the writ [to] cases where there is no possibility that fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 562 U.S. at 103. Fr. Wenthe's argument implies that because there was disagreement among a number of Minnesota judges regarding the proper disposition of the issues he raises here, this Court is now free to reach its own decision about which of these judges were right and which were wrong. Unfortunately for Fr. Wenthe, that is precisely the opposite of how AEDPA's "unreasonable application" standard works.

## II.    Due Process and the Right to Testify

Fr. Wenthe asserts that the trial court deprived him of his due process right to testify in a meaningful way when it prohibited him from presenting evidence concerning A.F.'s sexual history. Pet. at 31-39. He asserts that he was "permitted by clearly established law to contest the element of whether he provided the spiritual advice" required to convict a clergyman under Minnesota's clergy sexual conduct statute. *Id.* at 33. Fr. Wenthe specifically states that he should have been permitted to testify about a lengthy conversation that occurred on November 12, shortly before his first sexual contact with A.F. He would have testified that A.F. "told him that with past boyfriends that she enjoyed oral sex, that anal sex was something that she had experienced, that given her experience and her past that she would enjoy doing the same with him, and that conversation that she had with him formulated his intentions the next day and his intentions as the relationship progressed." *Id.* at 33-34. According to the petition, Fr. Wenthe should have been able to present this evidence to the jury to articulate his defense that the relationship had ceased to be pastoral and had instead transformed into a sexual relationship. *See id.* at 34.

The Respondent argues that no writ of habeas corpus should be issued on this basis because the Minnesota Supreme Court identified the correct legal principle—Fr. Wenthe's right to present a complete defense—and reasonably applied controlling precedent related to that right. Resp't Mem. at 14-20. Moreover, the Respondent

argues that even if the Minnesota Supreme Court erred in some way by excluding the proffered evidence, such an error was harmless beyond a reasonable doubt, and Fr. Wenthe cannot show that the error was so substantial that it eliminated the fundamental fairness of his trial. *See id.* at 18-20.

### A. Applicable Law

Federal habeas courts may only review state court evidentiary rulings to determine if an alleged error implicates the accused's due process rights. *Bailey v. Lockhart*, 46 F.3d 49, 50 (8th Cir. 1995) (explaining that because "[a] state court's evidentiary ruling is a matter of state law," federal courts "may examine the ruling in a habeas proceeding only to determine whether the asserted error denied due process"). "To establish a due process violation warranting federal habeas relief, [a habeas petitioner] must prove that the [evidentiary] error was 'so gross' . . . 'conspicuously prejudicial' . . . or otherwise of such magnitude that it fatally infected the trial and failed to afford [the petitioner] the fundamental fairness which is the essence of due process." *Kerr v. Caspari*, 956 F.2d 788, 789 (8th Cir. 1992) (quoting *Rainer v. Dep't of Corr.*, 914 F.2d 1067, 1072 (8th Cir. 1990)). "'To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety the verdict probably would have been different.'" *Gee v. Groose*, 110 F.3d 1346, 1350 (8th Cir. 1997) (quoting *Anderson v. Goeke*, 44 F.3d 675, 679 (8th Cir. 1995)).

Due process mandates that someone charged with a crime have the ability to defend himself. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). This "meaningful opportunity" includes the defendant's right to testify on his own behalf. *Rock v. Arkansas*, 483 U.S. 44, 52-53 (1987). "This right is abridged by [state] evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are

designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotations and alterations omitted). Accordingly, a state "may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony." *Rock*, 483 U.S. at 55.

The right to present a complete defense, including through the accused's own testimony, is not without limits. "[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 325. "[T]he Constitution permits judges 'to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'" *Id.* at 326-27 (quoting *Crane*, 476 U.S. at 689-90) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (ellipsis and brackets in *Van Arsdall*). "An accused 'does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" *Khaalid v. Bowersox*, 259 F.3d 975, 978 (8th Cir. 2001) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)).

## B. The Minnesota Supreme Court's Decision

At trial, Fr. Wenthe proffered that if he were allowed to, he would testify about a lengthy conversation he had with A.F. and how:

> she told him that with past boyfriends that she enjoyed oral sex, that anal sex was something that she had experienced, that given her experience and her past that she would enjoy doing the same with him, and that conversation that she had with him formulated his intentions the next day and his intentions as the relationship progressed.

*Wenthe IV*, 865 N.W.2d at 305-06. The Minnesota Supreme Court's decision in *Wenthe IV* addressed this issue, identified the tension between the State's rape shield law and the Due Process Clause, and concluded that Fr. Wenthe's federal constitutional rights were not violated.

12

Applying Minnesota's rape shield law, the *Wenthe IV* court stated that the trial court had improperly allowed the State to introduce evidence that A.F. was sexually inexperienced and abstained from vaginal intercourse to protect her virginity because the applicable evidentiary rule applies to both the prosecution and the defense. 865 N.W.2d at 306-07. However, the court further held that this did not mean the trial court erred in precluding Fr. Wenthe from presenting his proffered evidence about A.F.'s statements to him concerning her past sexual relationships with previous boyfriends and specific sex acts she had experienced. *Id.* at 307. The court reasoned that such evidence "merely shows that A.F. had previous sexual partners[,] . . . provides little insight into her specific relationship with Wenthe, and offers few clues as to whether she was less likely to have sought spiritual advice while engaging in sexual conduct with him." *Id.* The *Wenthe IV* court carefully analyzed Fr. Wenthe's complete-defense claim and explained why it reached the conclusion that the probative value of his proffered testimony was outweighed by unfair prejudice, confusion of the issues, or potential to mislead the jury.

Further, the court found that Fr. Wenthe was not entitled to admission of his proffered evidence as a means of proving the source of A.F.'s sexual knowledge because the circumstances did not create a likely inference that she "fabricated the sexual conduct" given that Wenthe conceded sexual penetration occurred. *Id.* at 307. Finally, the *Wenthe IV* court concluded that even if it were error for the trial court to have prohibited Fr. Wenthe from offering the evidence he proffered, that error was harmless beyond a reasonable doubt because: (1) A.F.'s own testimony undercut the State's suggestion that she was inexperienced; (2) Wenthe was able to testify that he and A.F. discussed their interest in various types of sexual behavior and their past sexual practices; (3) Wenthe's counsel cross-examined A.F. about her conversations with Wenthe concerning sexual matters; and (4) Wenthe was allowed to testify about his perception of his relationship with A.F., though the jury appeared to reject his version of the facts. *Id.* at 307-08.

### C. No Unreasonable Application of Clearly Established Law[3]

The Minnesota Supreme Court's handling of this issue in *Wenthe IV* was not an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court. It was not unreasonable for the Minnesota Supreme Court to conclude that the testimony Fr. Wenthe wanted to give would merely show that A.F. had previous sexual partners, provide little insight into her relationship with Fr. Wenthe, and did little to demonstrate whether A.F. was seeking religious or spiritual advice, aid, or comfort.

It was also reasonable for the *Wenthe IV* court to reject Fr. Wenthe's "source of knowledge" argument for admissibility of the testimony. *See* 865 N.W.2d at 307. The court explained that a complainant's source of sexual knowledge "becomes relevant only when the defendant asserts that the complainant fabricated sexual conduct," whereas Fr. Wenthe conceded that sexual penetration occurred in this case.[4] *Id.* And

---

[3]    Although Fr. Wenthe states that the Minnesota Supreme Court "rendered a decision contrary to clearly established federal law" on this due process claim, *see* Pet. at 38, the Court disagrees. The *Wenthe IV* court recognized that the claim implicates due process concerns and noted that State evidentiary rules must not prevent a defendant's ability to present a complete defense. *See Wenthe IV*, 865 N.W.2d at 306-07 (discussing an accused's constitutional right to due process, to confront accusers, and to offer evidence in his own defense and analyzing whether the trial court's exclusion of evidence was relevant and prejudicial). Neither Fr. Wenthe's petition nor his reply explains how *Wenthe IV* allegedly arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or reached the opposite result as the Supreme Court on materially indistinguishable facts. Instead, Fr. Wenthe really argues that *Wenthe IV*'s handling of this issue involved an "unreasonable application" of clearly established federal law. *Marcrum v. Luebbers*, 509 F.3d 489, 504 (8th Cir. 2007) ("Because the state courts correctly identified the governing legal rules . . . only the 'unreasonable application' clause . . . concerns us here"). Accordingly, the Court focuses on that analysis, but concludes that Fr. Wenthe has failed to meet that difficult standard.

[4]    Where an alleged victim's youth or other characteristics might suggest to the jury unfamiliarity with and, as a result, inability to describe sexual acts, the jury might

*(footnote continued on next page)*

the court reasoned that A.F.'s general source of knowledge of sexual matters was "largely irrelevant to the primary disputed question of whether she sought or received spiritual counsel." *Id.* Such a rationale for affirming the trial court's decision to exclude Fr. Wenthe's testimony aligns with the purpose of Minnesota's rape shield law. Fr. Wenthe does not explain how this analysis is an objectively unreasonable application of the United States Supreme Court's precedent governing the right to present a complete defense.

The *Wenthe IV* court's harmless error conclusion concerning the exclusion of Fr. Wenthe's proffered sexual-history evidence was also not objectively unreasonable. Specifically, the Minnesota Supreme Court found that the outcome of the trial would have been the same even if he had been permitted to testify as he wished because the jury heard similar evidence when A.F.'s testified that she "dissociated" during sexual conduct with other partners. *Wenthe IV*, 865 N.W.2d at 308. He was also permitted to testify that he and A.F. discussed the sexual behaviors that might interest them and their past sexual practices. *See id.* Moreover, Fr. Wenthe testified about his belief that his relationship with A.F. changed quickly to one based on sexual desire rather than spiritual advice. *Id.* Given that the jury heard all of this evidence, it was not objectively unreasonable for the Minnesota Supreme Court to conclude that the verdict would have been the same even if Fr. Wenthe had been allowed to testify as he proffered. Fr. Wenthe has not shown "that there is a reasonable probability" that absent the exclusion of his proffered sexual history evidence the jury's verdict "probably would have been different." *Gee v. Groose*, 110 F.3d at 1350.

---

(*footnote continued from previous page*)
infer that the defendant's commission of the sexual assault was the only source for sexual knowledge. In such a case, sexual-history evidence can be relevant to rebut just such an inference. *Wenthe IV*, 865 N.W.2d at 307 (citing Harriett R. Galvin, *Shielding Rape Victims in the State and Federal Courts: A Proposal for the Second Decade*, 70 Minn. L. Rev. 763, 866 (1986)). That is not the case here.

Although the Court concludes that the Minnesota Supreme Court did not unreasonably apply federal law, it shares Fr. Wenthe's concern about the State's conduct in this case. The State elicited evidence from A.F. about, and made arguments to the jury concerning her lack of sexual experience and argued that fact to the jury. Given that the State was allowed to make a one-sided presentation about A.F.'s sexual history, a juror could have been more likely to infer that she was seeking religious or spiritual advice, aid, or comfort from Fr. Wenthe when she met with him and the two engaged in sexual conduct than if the jury heard Fr. Wenthe's additional testimony about her sexual background. One could also posit, as Justice Page did in his dissent in *Wenthe IV*, that Fr. Wenthe's proffered sexual-history evidence was, in fact, probative of a shift in the nature of Wenthe's relationship with A.F. from one of religious advisor to a romantic relationship between two willing adults. 865 N.W.2d at 314 (Page, J., dissenting). However, simply because this Court might have decided these issues differently than the majority in *Wenthe IV* does not mean that Fr. Wenthe is entitled to habeas relief. *See Williams*, 529 U.S. at 362 (noting that habeas relief is not available under AEDPA even when the federal district court believes that the state court decision involved "an incorrect or erroneous application of federal law"). The disagreement about these issues does not render the Supreme Court's conclusions objectively unreasonable.

### D. Minnesota's Rape Shield Law

Fr. Wenthe appears to argue that the *Wenthe IV* court's application of Minnesota's rape shield law violated his due process rights because the law is an arbitrary or categorical prohibition on the introduction of certain evidence. The Court disagrees.

Recently, the Supreme Court stated that "[o]nly rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence," and cited several cases where a state rule was "arbitrary," "did not serve any discernible purpose," was unsupported by any reason offered by the state, or otherwise incapable of rational defense. *Nevada v. Jackson*, 133

16

S. Ct. 1990, 1992 (2013) (citing *Holmes*, 547 U.S. at 331; *Rock v. Arkansas*, 483 U.S. 44, 61 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 302–303 (1973); and *Washington v. Texas*, 388 U.S. 14, 22 (1967)). Minnesota's rape shield law is not such an indefensible and arbitrary state rule. As the *Wenthe IV* court observed: "[t]he rape-shield law 'serves to emphasize the general irrelevance of a victim's sexual history, not to remove relevant evidence from the jury's consideration.'" *Wenthe IV*, 865 N.W.2d at 305 (quoting *State v. Crims*, 540 N.W.2d 860, 867 (Minn. App. 1995)) (citing *State v. Elijah*, 289 N.W. 575, 577, 579 (1940)).

Fr. Wenthe relies on *Rock v. Arkansas*, 483 U.S. 44 (1987), and *Lawrence v. Texas*, 539 U.S. 558 (2003),[5] to support his argument. Unfortunately for Fr. Wenthe, neither of these cases addresses a due process challenge to a state's application of a comparable evidentiary rule.

In *Rock v. Arkansas*, Vickie Rock was charged with manslaughter in the death of her husband, Frank, following a domestic dispute. 483 U.S. at 45. When police arrived "they found Frank on the floor with a bullet wound in his chest," and Vickie was removed from the building to prevent her from interfering with the investigation. *Id.* at 45-46. One of the investigators testified that Vickie made incriminating statements about the shooting, but she could not remember the precise details, so her attorney suggested that hypnosis be used to refresh her memory. *Id.* at 46. She was interviewed under hypnosis twice and was able to recall certain details of the shootings that

---

[5]    Respondent asserts that Fr. Wenthe did not properly raise a complete-defense or due process claim based on *Lawrence* to the state courts. Resp't Mem. at 18. In Wenthe's brief to the Minnesota Supreme Court before *Wenthe IV*, he cited *Lawrence*, but in the context of his argument concerning the trial court's instructions regarding *mens rea* and the interpretation of the clergy sexual conduct statute. App. to Resp't's Mem., Ex. 23, ECF No. 6-4 (Wenthe's Second Br. to Minn. Supreme Ct. at 35). In his original brief to the Minnesota Court of Appeals, Fr. Wenthe cited *Lawrence* in the context of his Establishment Clause challenge. App. to Resp't's Mem., Ex. 1 (Wenthe's First Br. to Court of Appeals at 45). The Court need not resolve whether Fr. Wenthe properly raised a due process argument based on *Lawrence* to the state courts because *Lawrence* provides no basis for habeas relief on this issue.

arguably exonerated her. *Id.* at 46-47. The prosecution moved to exclude Vickie's testimony that had been refreshed by the hypnosis and the trial court deemed it inadmissible. *Id.* The state supreme court rejected Vickie's argument that the exclusion of the testimony violated her right to present a complete-defense based on a "*per se*" rule prohibiting that testimony. *Id.* at 48-49. Recognizing that "the most important witness for the defense in many criminal cases is the defendant himself," *id.* at 52, the Supreme Court reversed. It held that criminal defendants have a right to testify in their own behalf under the Due Process Clause of the Fourteenth Amendment. *Id.* at 49-53. The Court also recognized that "the right to present relevant testimony is not without limitation, . . . [b]ut restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 55-56. The "*per se*" rule applied by the state supreme court did not allow the trial court to consider whether the testimony should be admissible in the specific case before it. *Id.* at 56-62; *see also id.* at 61 ("A State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case.").

The *Wenthe IV* court did not unreasonably apply the standards articulated in *Rock* that protect a criminal defendant's due process right to testify on his own behalf. *Rock* did not involve a state's application of a rape-shield law, but a *per se* rule that barred the admission of a category of evidence regardless of its reliability. In contrast, Minnesota's rape shield law is neither an arbitrary nor an inflexible rule that precludes a trial court's inquiry into the reliability of the evidence at issue or its potential probative value. Moreover, the due process rule identified in *Rock* is fairly general. It provides that a criminal defendant has a right to testify subject to limitations imposed by the purposes state evidentiary rules are designed to serve. This holding gives state trial courts substantial leeway in considering whether the specific evidence proffered should be admitted. Given that leeway, the range of reasonable choices for state courts is broader, making it more difficult to show that a state court's decision in a given case was objective unreasonable. *Cf. Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) ("Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating

18

whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court's decision in *Lawrence* provides even less assistance to Fr. Wenthe. That case held that state laws criminalizing consensual sexual contact between two adults of the same sex violate substantive due process rights secured by the Fourteenth Amendment. 539 U.S. 558. That holding is inapplicable here. *Lawrence* did not address a criminal defendant's due process right to testify in his own defense or a state's application of an evidentiary rule that precluded the defendant from presenting specific evidence. Nothing in the *Wenthe IV* court's decision can be said to have involved an unreasonable application of any rule announced in *Lawrence*, and Fr. Wenthe's reliance on it here is misplaced.

### Conclusion

For the foregoing reasons, the *Wenthe IV* court's conclusion that exclusion of Fr. Wenthe's proffered testimony concerning A.F.'s sexual history did not deprive Wenthe of his right to present a complete defense was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Accordingly, Fr. Wenthe is not entitled to the writ of habeas corpus based on Ground One of his Petition.

### III.   Right to Cross Examine

Ground Two of Fr. Wenthe's Petition asserts that he was denied his constitutional right to cross-examine A.F. about her sexual history. Pet. at 39-43. Fr. Wenthe articulates this as a "due process right to cross examine the alleged victim concerning the reasons she had given to him why she consented to sex." Pet. at 1. Fr. Wenthe frames this as both a due process and a Confrontation Clause claim. For reasons closely related to those just discussed, the Court concludes that this claim for relief also fails.

### A. Fair Presentation

The Respondent argues that that the AEDPA precludes this Court's review of Fr. Wenthe's claim regarding cross-examination because it was never fairly presented to the Minnesota Supreme Court prior to the decision in *Wenthe IV*. Resp't's Mem. at 20-21. Specifically, Respondent asserts that Fr. Wenthe only raised this argument in the context of his due process right to present a defense and, as a result, any Confrontation Clause claim Wenthe presents now has been procedurally defaulted. *Id.* Fr. Wenthe asserts that he did adequately raise a claim under the Confrontation Clause. Pet'r's Reply at 2-5. The Court concludes that the Respondent has the better of the argument, but need not ultimately resolve the issue because Fr. Wenthe is not entitled to relief under the Confrontation Clause even if the claim is preserved.

When Fr. Wenthe raised the issue of the trial court's prohibition on offering sexual-history evidence through cross-examination, he asserted that he "was denied his right to due process to present his case . . . ." Resp't's App., Ex. 1 (*Wenthe I* Br. at 21). He cited state cases concerning the due process right. *Wenthe I* Br. at 21 (citing *State v. Beecroft*, 813 N.W.2d 814, 836 (Minn. 2012)). He then cited *State v. Friend*, 493 N.W.2d 540, 545 (Minn. 1992), which did note that "the right to confront accusers" would require admission of evidence excluded by the rape shield law in some cases. *Wenthe I* Br. at 26. Fr. Wenthe also relied upon *State v. Crims*, 540 N.W.2d 860, 867 (Minn. Ct. App. 1995), which specifically noted that the "Confrontation Clauses of the Federal and Minnesota Constitutions . . . afford[] a defendant the opportunity to advance his or her theory of the case by revealing an adverse witness's bias or disposition to lie." *Wenthe I* Br. at 26.

Unfortunately for Fr. Wenthe's current position, he changed the focus when he briefed this issue on appeal to the Minnesota Supreme Court. Fr. Wenthe again cited cases concerning the due process right, Resp't's App., Ex. 23 (*Wenthe IV* Br. at 37), and he discussed his right to cross-examine A.F. as part of his due process right to present a complete defense. *Wenthe IV* Br. at 42. But he did not mention the Confrontation Clause or the Sixth Amendment to the United States Constitution in this portion of his brief or cite to federal or state cases analyzing the Confrontation Clause.

To fairly present a claim to the state courts so that it is preserved for habeas review, the petitioner must raise the claim with the state court by referring in his brief

to "a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." *Cox v. Burger*, 398 F.3d 1025, 1031 (8th Cir. 2005) (quoting *Barrett v. Acevedo*, 169 F.3d 1155, 1161-62 (8th Cir. 1999)). Further, if the state has a "two-tiered system" with an intermediate appellate court and a state supreme court (like Minnesota), the petitioner must present the federal nature of the claim at each level of an established state appellate review process to preserve the claim for habeas review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Even if Fr. Wenthe is correct that his citation to *State v. Friend* or *State v. Crims* in his brief to the Minnesota Court of Appeals prior to *Wenthe I* was sufficient to fairly present a Confrontation Clause claim for purposes of that round of the appeal, this does not end the inquiry regarding preservation of the issue for habeas purposes. Fr. Wenthe does not explain how he presented the sexual-history-cross-examination issue as a Confrontation Clause claim through his brief to the Minnesota Supreme Court on the issue, and the Court can find no argument raised that would be sufficient to preserve the issue pursuant to *O'Sullivan*.[6]

The Respondent has persuasively argued that a Confrontation Clause claim was not "fairly presented" under controlling authority from the United States Supreme Court, and this suggests that Fr. Wenthe has not preserved such a claim for federal review. However, as explored below, even if he had preserved the claim, the Court's conclusion about the merits would be unchanged, and it is for this reason (not procedural default) that the Court recommends his habeas claim be denied.

---

[6]   In his brief to the Minnesota Supreme Court prior to the decision in *Wenthe IV*, Fr. Wenthe also cited *Anderson v. State*, 830 N.W.2d 1 (Minn. 2013), which discusses the Confrontation Clause. *Wenthe IV* Br. at 42. However, the discussion of the Confrontation Clause in *Anderson* involved questions whether out-of-court statements were "testimonial" for purposes of *Crawford v. Washington*, 541 U.S. 36, 68 (2004), and Fr. Wenthe cited to a different passage in *Anderson* that specifically addressed a defendant's due process right to testify. *Wenthe IV* Br. at 42 (citing *Anderson*, 830 N.W.2d at 11). Neither party presents any argument whether such a citation is sufficient to preserve a claim for habeas review, and therefore the Court will not address this issue.

**B. Identical Standard**

Whether Fr. Wenthe's claim about the infringement on his right to cross-examine A.F. is viewed as a Confrontation Clause issue or a due process one, the Court's analysis under the AEDPA is essentially the same. Moreover, that analysis duplicates the Court's consideration of the due process implications of limitations on Fr. Wenthe's right to testify.

The Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend VI. "[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 674, 678 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)); *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (explaining that the right to cross-examine is "[i]mplicit in the constitutional right of confrontation"). But, the Constitution guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 678.

These considerations implicate the same analysis applied above regarding a criminal defendant's due process right to present a complete defense. *Compare Van Arsdall*, 475 U.S. at 678 (discussing "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"), *with Holmes*, 547 U.S. at 326-27 (explaining that the limits on the due process right to present a complete defense allow "judges 'to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of harassment, prejudice, [or] confusion of the issues'") (internal quotations omitted). Under either inquiry, a state trial court has the power to apply non-arbitrary state evidentiary rules and take into consideration the probative value and potential prejudicial effect of proffered evidence. The trial court can also consider other factors consistent with the purpose of the state evidentiary rule under either standard as well. Accordingly, even if the

22

Court assumes here that Fr. Wenthe preserved his cross-examination claim as implicating his rights under the Confrontation Clause, he is not entitled to habeas relief for precisely the same reasons identified in Part II of this Report and Recommendation.

### C. *Olden v. Kentucky*

In challenging the constitutionality of the trial court's limitations on cross-examination, Fr. Wenthe focuses significant attention on the United States Supreme Court's decision in *Olden v. Kentucky*, 488 U.S. 227 (1988). The Court's consideration of the impact of *Olden* on the validity of the Minnesota Supreme Court's handling of the cross-examination issue is considerably complicated by the fact that Fr. Wenthe did not cite that decision in his briefing to that court. *See* Resp't's App., Ex. 23 (*Wenthe IV* Br.). Nonetheless, a thorough exploration of *Olden* reveals that it does not undermine the validity of the state court's analysis.

In *Olden*, James Olden and Ray Harris were indicted for kidnapping, rape, and forcible sodomy. 488 U.S. at 228. The alleged victim, Ms. Matthews, testified that Olden raped her while Harris held her down. *Id.* The State of Kentucky also introduced the testimony of a man named Bill Russell, who testified that later on the evening in question, Matthews was dropped off at his house and told Russell that Olden and Harris had raped her. *Id.* at 229. Olden told a different story. He asserted that Matthews propositioned him and the two had consensual sex behind the bar, and then Harris drove them to another location so they could engage in sex again. *Id.* at 228. Olden also presented a theory that Matthews had fabricated the accusations of rape to protect her extramarital relationship with Russell because both she and Russell were married to other people at the time of the alleged sexual assault, but were also involved with each other. *Id.* at 229-30. The alleged victim testified that she was living with her mother at the time of trial, but in truth she had moved in with Russell by that point, and Olden sought to cross-examine the victim regarding her living arrangements. *Id.* at 230. The trial court prohibited that cross-examination, and the Kentucky appellate court upheld the ruling under the State's rape shield law despite the relevance of the proffered cross-examination. *Id.* at 230-31. The Kentucky appellate court also reasoned that the cross-examination would have been unfairly prejudicial to the State because Matthews was white and Russell was black, and evidence of their relationship would have prejudiced the jurors against Matthews. *Id.* at 231.

The Supreme Court reversed the conviction in a summary decision and found that Olden's proffered cross-examination had a strong potential to show that Matthews had falsified her testimony out of a desire to protect her relationship with Russell. *Id.* at 232. Further, the Court found that the state appellate court's rationale for prohibiting Olden's proffered inquiry—i.e., that the alleged victim's interracial relationship would prejudice the jury against her—was speculative and therefore insufficient to overcome "cross-examination with such strong potential to demonstrate the falsity of Matthews' testimony." *Id.* Although "a trial court may, of course, impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant,'" the Court explained, "the limitation here was beyond reason." *Id.* at 232 (quoting *Van Arsdall*, 475 U.S. at 679).

The *Olden* decision does not support Fr. Wenthe's argument that the Minnesota Supreme Court unreasonably applied clearly established United States Supreme Court precedent in his case. Most importantly, there is no indication that the *Wenthe IV* court would have analyzed a claim based on the Confrontation Clause and *Olden* any differently than it analyzed his due process claim, and this Court has already concluded that the due process analysis in *Wenthe IV* was not objectively unreasonable. *Olden* does not change that conclusion. The *Wenthe IV* court reasonably determined that Fr. Wenthe's proffered cross-examination was of limited probative value on any material issue and that its exclusion, even if in error, was harmless.

In addition, the impact of *Olden* is strongest when a proffered cross-examination is designed to explore whether a witness had a motive to lie, a circumstance not present here. *See United States v. Dale*, 614 F.3d 942, 957 (8th Cir. 2010) (citing *Olden* for the proposition that "prohibiting a criminal defendant from exploring a witness's motive to lie violates the Sixth Amendment"). Fr. Wenthe's proposed cross-examination of A.F. concerning her sexual history may arguably have been relevant to the inquiry under the clergy sexual conduct statute whether the purpose of the meeting was for spiritual aid or guidance. But there is no indication in Fr. Wenthe's petition or elsewhere that the cross-examination would have revealed any motivation by A.F. to testify falsely. Fr. Wenthe's proposed cross-examination about A.F.'s sexual history was, therefore, not clearly "'designed to show a

prototypical form of bias on the part of the witness.'" *Olden*, 488 U.S. at 231 (quoting *Van Arsdall*, 475 U.S. at 680).

Moreover, even if Fr. Wenthe's proffered cross-examination were relevant to show that A.F. had some motivation to falsify her testimony, the trial court could still have constitutionally excluded the evidence if its potential to show such a motive were not particularly strong. In *United States v. Pumpkin Seed*, 572 F.3d 552 (8th Cir. 2009), the court contrasted Matthews' clear motive to lie in *Olden* with Mr. Pumkin Seed's proffered cross-examination about a victim's purported motivation to falsify a claim of rape. Unlike the cross-examination contemplated in *Olden*, in *Pumpkin Seed*, the prohibited cross-examination of the victim had "little, if any, potential to demonstrate the falsity of her testimony." *Id.* at 561; *see also id.* ("In *Olden*, the defendant's evidence of the [Matthews'] extramarital relationship with [Russell] was highly probative of the [Matthews'] motive to make a false rape claim, given that [Russell] caught [Matthews] and Olden in a compromising position, which would threaten her ongoing relationship with [Russell].") And even prior to the passage of AEDPA and the adoption of its more deferential standard of review, the Eighth Circuit distinguished *Olden* in a habeas case on grounds that the petitioner's *in camera* proffer about his intention to cross-examine the victim about her sexual history "failed to establish that the victim was seriously involved with a third party, much less a jealous boyfriend." *Freeman v. Erickson*, 4 F.3d 675, 677-79 (8th Cir. 1993).

### D. Conclusion

It was not objectively unreasonable for the *Wenthe IV* court to conclude that exclusion of Fr. Wenthe's proposed cross-examination of A.F. regarding her sexual history was consistent with his constitutional rights. Even if Fr. Wenthe adequately raised this issue as a Confrontation Clause claim, the analysis of that issue would have tracked the *Wenthe IV* court's consideration of his right to present a complete defense under the Due Process Clause. Because this Court has found the *Wenthe IV* court's handling of the due process issue was reasonable, Fr. Wenthe's Confrontation Clause claim should be denied. His reliance on *Olden v. Kentucky* does not change that conclusion. Accordingly, the Court concludes that Ground Two of Fr. Wenthe's petition provides no basis for habeas relief.

**IV.    Minnesota's Clergy Sexual Conduct Statute:** *Mens Rea*

Fr. Wenthe next challenges the Minnesota Supreme Court's interpretation of the *mens rea* required to violate the clergy sexual conduct statute. *See* Pet. at 43. The *Wenthe IV* court found that the State had to prove that Fr. Wenthe knowingly engaged in an act of penetration with A.F., but not that he knew the purpose of the meeting at which the penetration occurred was to provide spiritual aid, comfort, and advice. Relying on *United States v. Bruguier*, 735 F.3d 754 (8th Cir. 2013), Fr. Wenthe argues that this reflects an unreasonable application of clearly established federal law requiring criminal statutes to link each element of the offense to the defendant's intent. *See id.* at 44-49.

In *Wenthe IV* the Minnesota Supreme Court addressed Fr. Wenthe's claim as one concerning the proper interpretation of the clergy sexual conduct statute, not as a claim premised on any provision of federal constitutional law. *See* 865 N.W.2d at 301-05. The Respondent argues that this is no surprise because Fr. Wenthe raised the issue during the state court proceedings as one of statutory interpretation, not by reference to Due Process Clause of the Fourteenth Amendment, which he now appears to invoke in his Petition. Resp't's Mem. at 24-30.

Regardless of whether Fr. Wenthe presented this claim as a matter of federal due process to the State courts, he has failed to show that the decision in *Wenthe IV* was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. To the extent he challenges the Minnesota Supreme Court's conclusion that, as a matter of state law, the clergy sexual conduct statute does not require proof that he intended the purpose of the meeting to be pastoral, this Court could not grant habeas relief even if it agreed with the argument. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law . . . [and] it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Even by reference to the federal constitution, his claim fails. First, it is not entirely clear what principle of due process Fr. Wenthe claims the Minnesota Supreme Court failed to recognize or unreasonably applied. He does not point to any United States Supreme Court case holding that due process requires a state court to interpret

a state criminal statute so that the prosecution must prove the defendant had intent with respect to each element of the crime.

Instead, Fr. Wenthe relies on cases applying federal principles of statutory interpretation that reached conclusions similar to the conclusion he advocated to the *Wenthe IV* court. In his Petition he cites *Bruguier*, *Staples v. United States*, 511 U.S. 600 (1994), and *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009). Fr. Wenthe appears to argue that these decisions interpreted the respective statutes at issue as they did—requiring heightened showings of *mens rea*—because due process requires *mens rea* as to each element of any criminal statute. But the cases do not stand for such a proposition,[7] and case law more directly on point shows that Fr. Wenthe's position lacks merit. The Eighth Circuit has rejected a habeas petitioner's claim that an Arkansas sexual indecency law violated due process because it did not require proof that the petitioner knew the victim was underage. *Neely v. McDaniel*, 677 F.3d 346, 351-53 (8th Cir. 2012). The Arkansas statute made it a crime for an adult to solicit minor children to engage in sexual acts. Even assuming that the Arkansas law imposed strict liability on an accused who is ignorant of the victim's age, the Eighth Circuit concluded that "the lack of a mens rea requirement does not violate the accused's due process rights." *Id.* at 352. Fr. Wenthe identifies no United States Supreme Court precedent, nor any appellate authority or that matter, that clearly established a contrary rule of due process that must be applied here.

For these reasons, the Court concludes that Fr. Wenthe is not entitled to a writ of habeas corpus based on the claim raised in Ground Three of his Petition.

---

[7]     *Flores-Figueroa*, 556 U.S. at 650-57 (discussing the textual reasons to interpret the term "knowingly" in a statute criminalizing the unauthorized transfer, possession, and use of another person's means of identification to apply to each element in the statute); *Staples*, 511 U.S. at 604-20 (analyzing, as a matter of statutory construction and application of a common law presumption, whether a law that prohibited unregistered possession of a machine gun required the defendant to know the characteristics of the weapon that triggered the registration requirement); *Bruguier*, 735 F.3d at 758-62 (applying principles of statutory construction to infer the intent of Congress).

## V.    The First Amendment's Establishment Clause

In Ground Four of his Petition, Fr. Wenthe asserts that Minnesota's clergy sexual conduct statute, both on its face and as applied, violates the Establishment Clause because it creates an excessive entanglement between the State and religion. Pet. at 49-58. In *Wenthe II*, the Minnesota Supreme Court analyzed Fr. Wenthe's claim according to the test developed by the United States Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). 839 N.W.2d at 88-95. Under the so-called *Lemon* test, a law survives an Establishment Clause challenge under the following circumstances: "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; . . . [and] finally, the statute must not foster an excessive entanglement with religion." *Lemon*, 403 U.S. at 612-13 (internal citations and quotation marks omitted). The Court finds that the *Wenthe II* court's application of the *Lemon* test was reasonable.

### A. The Minnesota Supreme Court's Decision

In *Wenthe II* the court first analyzed Fr. Wenthe's challenge to the statute on its face. It concluded that Minnesota's clergy sexual conduct statute has a secular purpose based on its own prior case law. *Wenthe II*, 839 N.W.2d at 88 (citing *State v. Bussmann*, 741 N.W.2d 79, 86-87, 95-96, 96-98 (Minn. 2007). Essentially the *Wenthe II* court adopted the reasoning from *Bussmann* when it found that the statute has a secular purpose.

Under the second prong of the *Lemon* test, the court concluded that although the clergy sexual conduct statute has an incidental effect on clergy members "because it covers behavior committed by clergy within the scope of the clergy-parishioner relationship[,]" 839 N.W.2d at 88, it does not have the primary effect of inhibiting religion because it "does not impose burdens on becoming or remaining a clergy member of any religion, and it does not prevent individuals from seeking religious or spiritual aid, advice or comfort or otherwise interfere with efforts to seek such assistance[,]" *id.* at 89. The court also reasoned that the statute's specific focus on clergy did not give it the primary effect of inhibiting religion "because the limitation on members of the clergy is part of a larger statutory scheme that regulates the behavior of those involved in certain sexual relationships . . . for which the Legislature has determined there is a power imbalance between the parties." *Id.* at 89.

Turning to the final prong of the *Lemon* test, the *Wenthe II* court concluded that the clergy sexual conduct "does not create an excessive entanglement with religion because it applies neutral principles of law and regulates only secular aspects of clergy-parishioner relationships." 839 N.W.2d at 90. The court reasoned that the statute allows a court to "examine whether a clergy member is acting as a 'helper,' 'advisor,' or 'comforter,' according to secular notions of those relationships. *Id.* at 90-91 (quoting *The America Heritage Dictionary* 840 (3d ed. 1996)). And the Court found that "a jury or court can apply secular standards to determine whether advice, aid, or comfort was of a religious or spiritual nature, without testing or examining the validity of or basis for any particular aspect of the religious teaching or doctrine. . . ." *Id.*

The *Wenthe II* court also rejected Fr. Wenthe's as-applied challenge. 839 N.W.2d at 92-95. Fr. Wenthe argued "that the evidence at his trial allowed the religious doctrine of the Catholic Church to become entangled with the elements needed to prove a violation of the clergy-sexual-conduct statute." *Id.* at 92. However, the *Wenthe II* court concluded that the evidence presented at Wenthe's trial did not base the criminality of his conduct on religious doctrine rather than the statute's secular elements. *Id.* The court reasoned that evidence of A.F.'s view of the relationship and her letter to the archbishop, for instance, were connected to the secular standard of determining the nature of the relationship and "did not inform the jury of the Catholic Church's views but elicited A.F.'s personal understanding of the scope of the relationship and her personal beliefs about priests." *Id.*

Next, the court rejected Fr. Wenthe's argument that "the district court impermissibly allowed evidence regarding pastoral care policies and the Catholic Church's view of sexual misconduct by priests." Although Fr. Wenthe pointed to "testimony from church members stating that sex between a priest and a parishioner is 'unthinkable' or 'inappropriate' and testimony from other church officials about appropriate boundaries between priests and parishioners," the court described such evidence as "minimal." 839 N.W.2d at 93-94. The Court found that the majority of evidence relaying the church's concerns about sexual misconduct did not discuss church doctrine but "recalled A.F's description of the relationship." *Id.* at 94.

Finally, the *Wenthe II* court concluded that there was not an excessive entanglement problem due to the introduction of evidence about the church's response to the sexual relationship between A.F. and Fr. Wenthe, including meetings between church officials and Fr. Wenthe and A.F. 839 N.W.2d at 94-95. The *Wenthe II*

court found that this evidence did not create an excessive entanglement because it was relevant to secular standards, including whether Fr. Wenthe and A.F. "had sexual relations and whether [Fr. ]Wenthe was providing spiritual advice or comfort to A.F. when their sexual relations occurred." *Id.* at 94.

### B. No Unreasonable Application of Clearly Established Law

Fr. Wenthe does little in either his petition or his reply to explain how any part of the Minnesota Supreme Court's thorough decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. His overarching argument appears to be that the *Wenthe II* court unreasonably applied the *Lemon* test when it reinstated his conviction and rejected his Establishment Clause claim.

Having reviewed the *Wenthe II* court's conclusions and reasoning, the State court's judgment is neither contrary to nor an unreasonable application of clear Supreme Court precedent. The *Wenthe II* court identified the correct standard—the *Lemon* test—by which to judge an Establishment Clause claim. Fr. Wenthe does not identify a case with materially indistinguishable facts that the U.S. Supreme Court decided differently from *Wenthe II*. Therefore, the decision was not "contrary to" any clearly established Supreme Court precedent.

Similarly, the *Wenthe II* court's application of the *Lemon* test to Fr. Wenthe's facial challenge cannot be described as objectively unreasonable. Reasonable jurists could and did disagree about the conclusions the *Wenthe II* court reached with respect to the three prongs of the *Lemon* test, but this does not satisfy the high bar for habeas relief.[8] The *Wenthe II* court looked closely at each aspect of the *Lemon* test, considered Fr. Wenthe's arguments, and did not reject them arbitrarily. A reasonable jurist could conclude, as the *Wenthe II* court did, that the clergy sexual conduct statute does not have the primary effect of inhibiting religion because it does not prevent any person from becoming or remaining a member of any religion's clergy and is part of a

---

[8]   Fr. Wenthe spends several pages describing the Minnesota Supreme Court's decision in *Bussmann* and the conclusions reached on this issue in *Wenthe I* by the Minnesota Court of Appeals, *see* Pet. at 50-54, but this Court's review must focus on consideration of the decision in *Wenthe II* and a determination whether it involved an unreasonable application of clearly established U.S. Supreme Court precedent.

broader legislative scheme aimed at prohibiting sexual contact between individuals whose relationships are marked by a power imbalance. A reasonable jurist could also conclude that the clergy sexual conduct statute does not involve an excessive entanglement with religion because a court and jury can judge whether an individual was seeking religious or spiritual advice, aid, or comfort based on secular standards. These reasons are not "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Fr. Wenthe does not really engage the AEDPA standard at all, opting instead to repeat the perhaps valid concerns identified in *Bussmann*. But he makes no specific argument regarding the objective reasonableness of the state court's handling of his facial challenge. He therefore fails to show that the judgment in his case resulted from an unreasonable application of the *Lemon* test.

With respect to Fr. Wenthe's as-applied challenge, he has also failed to show that the *Wenthe II* court's decision was objectively unreasonable. After describing the *Wenthe II* court's conclusions in its consideration of his as-applied challenge, Fr. Wenthe's petition merely states "[w]e disagree." Pet. at 55. But disagreement with a state court's decision addressing a petitioner's claim, even one that divided the state appellate judges who considered that claim, is not sufficient to show that the state court's ultimate judgment involved an unreasonable application of clearly established Supreme Court precedents.

Fr. Wenthe argues that the Minnesota Supreme Court reached the wrong conclusion because it allowed him to be convicted based on the irrebuttable presumption that all clergy-parishioner relationships involve a power imbalance so that the parishioner is legally incapable of engaging in consensual sexual conduct. Pet. at 56-57. He asserts that the decision in his case involves an unreasonable application of *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979).[9] Pet. at 56. However, *Sandstrom* does not show that Fr. Wenthe is entitled to habeas relief. Mr. Sandstrom was convicted of

---

[9]    Fr. Wenthe did not cite *Sandstrom* to the Minnesota Court of Appeals prior to its decision in *Wenthe I* and did not rely on it in his briefing to the Minnesota Supreme Court prior to its decision in *Wenthe II* and, therefore, neither court had an opportunity to consider this argument. This again suggests that Fr. Wenthe has not preserved any habeas claim based on *Sandstrom*.

homicide after the jury was instructed that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Sandstrom*, 442 U.S. at 513. The U.S. Supreme Court reasoned that this instruction was similar to others that conflicted with the presumption of innocence. *Id.* at 522. Because the jury could have interpreted the instruction as shifting the burden to Mr. Sandstrom to prove that he did not have the requisite intent or imposing a conclusive presumption that he had such intent, the Court found the instruction unconstitutional. *Id.* at 524. But *Sandstrom* says nothing about either the First Amendment's Establishment Clause and Fr. Wenthe does not cite to any case that has relied on *Sandstrom* to conclude that a state criminal sexual conduct statute reflecting a legislative presumption about a power imbalance between two individuals presents an excessive entanglement with religion.

Fr. Wenthe also implies that because Justice Alan Page dissented in *Wenthe II*, this Court must grant habeas relief. He relies on the fact that the District Court granted a different habeas petitioner relief on a different claim in a different case based on Justice Page's reasoning in another dissent, and argues that the same must occur here. *See* Pet. at 57-58 (citing Justice Page's dissent on Confrontation Clause grounds in *State v. Bobadilla*, 709 N.W.2d 243 (Minn. 2006), and U.S. District Judge Patrick Schiltz's decision in *Bobadilla v. Carlson*, 570 F. Supp. 2d 1098 (D. Minn. 2008)). Precisely what standard Fr. Wenthe asks the Court to apply to this line of argument is unclear. Justice Page's dissent's identification of serious questions one might raise about the majority's conclusions in *Wenthe II* does not demonstrate that there is "no possibility that fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 562 U.S. at 103. This argument does not show that Fr. Wenthe is entitled to habeas relief.

### C. Conclusion

For all these reasons, the Court concludes that Fr. Wenthe is not entitled to habeas relief based on Ground Four of his Petition.

## VI.   Ground Five: Due Process and Unanimous Verdict

In Ground Five of his Petition, Fr. Wenthe asserts that the decision in *Wenthe IV* deprived him of his clearly established due process right to a unanimous verdict. Pet. at 58-61. Fr. Wenthe claims that the trial court was required to provide a more specific instruction to the jury that they needed to unanimously agree on the meeting

at which sexual penetration occurred, and all the jurors needed to agree that same meeting was for the purpose of spiritual advice, aid, or comfort. *Id.*

Relying on the recent Eighth Circuit decision in *Clark v. Bertsch*, 780 F.3d 873, 876-77 (8th Cir. 2015), Respondent argues that Fr. Wenthe has failed to preserve this claim for federal habeas review because he did not request a specific unanimity instruction at trial and the Minnesota Supreme Court reviewed the claim for only plain error. Resp't's Mem. at 35-37. Fr. Wenthe states that he objected to the last-minute amendment of the criminal complaint to add the single-meeting charge, but he does not point to any place in the record demonstrating that he requested a more specific unanimity instruction. Pet'r's Reply at 9.

The *Wenthe IV* court found that Fr. Wenthe had failed to request a specific unanimity instruction at trial and reviewed his unanimity claim for plain error. 865 N.W.2d at 298-01 (criticizing the State's charging decisions and presentation of evidence, but concluding that the absence of a specific unanimity instruction requested for the first time on appeal would not have affected the outcome of the case). *Bertsch* resolved an intra-circuit split, ultimately concluding that where a state appellate court reviews a defaulted claim under a plain error standard, the fact that the claim was considered does not excuse the procedural default. 780 F.3d at 876-77 (citing *Hayes v. Lockhart*, 766 F.2d 1247, 1252-53 (8th Cir. 1985), which affirmed a federal district court's conclusion that the habeas petitioner's due process claim concerning a jury instruction was barred from collateral review because he failed to comply with state procedural rules).

Minnesota courts have consistently held that "[f]ailure to object to jury instructions at trial 'generally constitutes a waiver of the right to appeal.'" *State v. Yang*, 774 N.W.2d 539, 557 (Minn. 2009) (quoting *State v. White*, 684 N.W.2d 500, 508 (Minn. 2004)); *State v. Cross*, 577 N.W.2d 721, 726 (Minn. 1998) ("A defendant's failure to propose specific jury instructions or to object to instructions before they are given to the jury generally constitutes a waiver of the right to appeal."). Because Fr. Wenthe raised the unanimity-instruction issue for the first time on appeal and the *Wenthe IV* court conducted a discretionary review of the issue for plain error, *Bertsch* compels the conclusion that this claim cannot be reviewed in a federal habeas corpus proceeding unless Fr. Wenthe shows cause and prejudice sufficient to excuse the default. *Bertsch*, 780 F.3d at 876-77 (holding that the "state court's discretionary plain-error review of

[the petitioner's] unpreserved claims cannot excuse his procedural default"); *see also Hayes*, 766 F.2d at 1252-53.

Fr. Wenthe does not argue that there was cause and prejudice for the failure to request the specific unanimity instruction at trial. Instead, he argues that in *Bertsch* the Eighth Circuit "misconstrues Supreme Court precedent." Pet'r's Reply at 9. This Court is not free to ignore the rule established in *Bertsch*. Accordingly, the Court concludes that Fr. Wenthe is not entitled to habeas relief based on the claim asserted in Ground Five of his Petition.

## Recommendation

Based on the foregoing, the Court makes the following recommendation:

1.  The Petition **[ECF No. 1]** should be **DENIED**.

2.  This action should be **DISMISSED WITH PREJUDICE**.

Date: December 11, 2017                    *s/Katherine Menendez*
                                            Katherine Menendez
                                            United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from

the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.